March 10, 2004

Mr. Don Brandon
STATE OF ALASKA
ADA Coordinator
801 West 10th Street, Suite A
Juneau, Alaska          99801

In re: Appeal from Alaska Department od Corrections and their agents findings to ADA Complaint.

Dear Mr. Brandon;

PURSUANT to Alaska DOC Policy & Procedure #808.16 and all applicable ADA laws and mandates, and having requested aditional time and received additional time, to submit this appeal in regards to the 12/14/03 incidents, I request review of the beforementioned findings of the Alaska DOC by and through Mr. Tim Lyden, Standards Administrator, their agents and the U.S. MARSHALS and their agents via proper and timely appeal.

On or about 12/14/03 I was transported with another 119 Alaska prisoners from the State of Alaska to Arizona, via U.S. Marshals, contract aircraft provider, to be housed in a contract detention center/owned and operated by Corrections Corporation of America.

As outlined in my informal attempt to resolve violations, which I submitted to the State of Alaska Standards Administrator, 1/10/04. He in turn issued a [5] page "non-resolution" in rebuttal, denying all of the stated facts I presented, denied requested reliefs, and basically called me a liar.

What I think paramount is that Mr. Lyden seems to be counting heavily on credibility, rather than facts, to persuade findings in favor of the violators. I will now present additional examinations of why his attempts to use credibility and not facts must fail in the final determination of this matter.

I will not linger on defending myself against baseless allegations of misconducts, except to state that both Mr. Matthew Itkowitz of the U.S. marshals Office, and Mrs. Cyndi Addington of the Alaska DOC, have given perjured statements in an "Official Investigation." Moreover I submit four (4) of the numerous voluntary written statements presented to me by prisoner members also on the flight, whom witnessed the incidents and have personal knowledges of the presented violations.

The Alaska DOC along with the Assistant Attorney General John Bodick, have viewed me, my exercising of my rights under the ADA and my disability, with distain and outrage. For some time these entities have attempted to send me out of state, in what I believe to be an act of retaliation, for their being directed to comply with ADA mandates and accommodations. They believe that a prisoner should not have any protections, in addition to what little other protections, we are to receive as a matter of law, under state statute and the combined Alaska and U.S. Constitutions.

1

EXHIBIT E

Their reasoning is that those protections can be manipulated and subsequentially disregarded if the prisoner is alleged to be a "problem inmate."

Over the years John Bodick has made clear his feelings, and has made claims that my privacy issues were "self-perceived", and has made essential, only to have that standing proven in err, with the privacy provisions and the accommodations thereto affirmed.

Mr. Tom Martin (retired) Alaska DOC Chief Classification Officer always thought my claims lacked legal substance, and he too made clear his feelings in a 9/22/03 response to a letter I sent to him regarding my concerns about ADA and possible transfer. [SEE EXHIBIT A] He stated quite clearly "I have **always thought** the issues regarding the ADA was somewhat **problematic** since we have had other prisoners within the facility in Arizona that have colostomies and several have stomas." "Therefore, I thought the other prisoners were TAKEN ADVANTAGE OF DUE TO THE COMPLAINT with them being housed outside the state." This response not only shows blatant misunderstanding that all ostomates are the same, but utter lack of knowledge, because all ostomates MUST have stomas. Furthermore, by this written statement Mr. Martin, I believe expresses the whole of Alaska DOC's distain, and attempts to place the DOC's shortsightedness on my shoulders.

On 9/19/03 I submitted an appeal to the proposed classification action wherein I was designated for placement in Arizona. The very first argument I presented was my needs to evacuate the contents of my pouch during the flight. I clearly explained to Mr. Don Stolworthy, Deputy Commissioner [SEE EXHIBIT B] that I understood the flight to be a long one and that my pouch REQUIRED FREQUENT EMPTYING, and to do this self-care I would REQUIRE both hands, water, a toilet, and my colostomy supplies and privacy. This I believe gave the Alaska DOC and their agents a realistic overview of what would be necessary for my self-care during the flight. On 10/16/03 Mr. Stolworthy responded to all of the arguments against transfer, and in his response to the beforementioned argument he stated: "Your first argument is the flight to Arizona is lengthy and would interfere with emptying your colostomy with according to you requires both hands, water, toilet, colostomy supplies and privacy.

By this response the requirements were understood, but my argument was not because the flight was lengthy and would interfere with emptying my colostomy, but that I REQUIRED what I had noticed him with to successfully care for myself during the flight. Moreover it would appear that Mr. Stolworthy believes my requirements not requirements at all, with his statement that my requirements "according to you."

I guess that he was advised by someone without complete knowledge of ostomies, how they work, and whom worked for Alaska DOC, and concluded that all ostomies are the same, work the same and can be managed the same, and further believed I was attempting to "get over" on the Alaska DOC. Typical really, if the DOC doesn't understand it then the prisoner must be manipulating them. [SEE EXHIBIT C].

To further understanding about the DOC Modus Operandi, in conjuntion with it's agents of CCA.

2

In reference to my disability and when Alaska DOC granted ADA Accommodations, that were to be met if transferred to CCA/FCC, an e-mail was sent from Mr. Lyden to Mr. Rodger Wilson FCC Quality Assurrance Manager, wherein Mr. Wilson apparently assured Mr. Lyden that they had "granted accommodations for inmate Earl (302235) based upon the November 2000 ADA Determination." However this e-mail was sent 1/13/04 three (3) days **before** the accommodations were granted, with the ADA Accommodations arising out of Alaska P&P #808.16 granted eight (8) days **after** the e-mail was sent and responded to.

Since there is no question as to my being disabled (28 CFR § 35.104) and being a sentenced prisoner whom qualifies for programs, services, and protections under the ADA Mandates (42. U.S.C. 112115(c)(2), the questions to be addressed will derive from actions and inactions of those authorities that knew or should have known that I was disabled and a "special needs" inmate. Through accommodations and reasonable modifications to their policies and procedures, should have and could have prevented the unnecessary discriminations and trauma I was forced to endure as a result of being disabled, before, during and after the transport flight in question.

Since the Alaska DOC and it's agents, the U.S. Marshals and it's agents as well as the "Contract" Owner/Operator of the [MD80] aircraft used to transport me, are all within the purview of the ADA, as both "public" and "private" entities, the ADA Mandates apply, and cannot be disrgearded, even if the allegations of my conduct were true.

In answer to Mr. Lyden's findings for the Alaska DOC, and apparently the U.S. Marshals, as well as the "Contract" aircraft provider, I submit in order of their appearance.

Under the heading "**Incident Investigation**" Medical Needs and Supplies: as to # 1 I cannot affirm nor deny that an extra nurse was brought on the transport flight , as claimed, but I can affirm that no one was given their perscription meds on the flight (with the exception of tylenol, aspirin, anti-acid tabs) and I was **not** given the opportunity to discuss my needs with anyone claiming to be a nurse (except of course when I was dragged behind a snowpile at subzero weather, with two (2) small hexigon plastic bottles (approx) 40cc worth, and a paper towel, ordered to empty the pouch at the direction of Mike Addington from his car, under the guards of two corrections officers and a U.S. marshal holding a shotgun on me, and certainly this was not during the flight.

As to # 2 The Anchorage Jail (herein after AJ) did in fact (after Ofc. Sherman came to my cell in the early a.m. and retrieved them) box up my supplies, which was done by Ofc. Holcomb. He assured me that "they wanted to be sure you had these during the flight." The box was labeled colostomy supplies, but as for the use of a ziplock bag I cannot affirm nor deny having **NEVER** seen the supplies the whole entire flight, eventhough security personnel knew or should have known I would eventually need to use them for self-care, during the flight.

As to # 3 I cannot affirm nor deny as to other inmates opportunity to use a restroom prior to the drive to the airfield. I can however affirm that I was escorted back out of he van, back into AJ to empty my pouch, prior to the drive, What is relevant is that colostomies do

NOT work all the same, and over time I have discovered that more frequent emptying occurs in the mornings than later in the day.

As to #4 I cannot affirm nor deny whether or not the U.S. Marshals were "briefed on the tarmac regarding the transfer" or "discussing all prisoners medical issues with flight nurse." What I can affirm is that from the way I was treated, even after urgent and adamant requests for my supplies were made and disgregarded, they apparently forgot to discuss me, and my special needs.

As to # 5 I can affirm that the "medical supplies were loaded onto (into) the plane', however what is not mentioned is whether or not the colostomy supplies (in the specially labeled box) **for use during the flight**, were made available to me as **REQUIRED**.

As to # 6 I cannot affirm nor deny whether or not the "flight nurse informed the lead marshal [ITKOWITZ]" that "**I would be given priority access to one of the restrooms**", but what I can affirm is when I asked to use the bathroom I was told to "**wait your turn.**"

As to # 7 The flight nurse did introduce herself to me, but, it was either a correctional officer or a marshal that made the statement that the contents of the pouch "will expand when reach higher altitudes and it would be better to empty anything out of it before we take off."

As to # 8 I cannot affirm nor deny what other inmates opportunities to relieve themselves was prior to boarding, only that I was taken behind a snowpile in subzero weather without proper supplies, shackled and handcuffed to bellychains, and ordered to "hurry up and empty it," then as I protested my treatment the three guards became verbally belligerant and agressive towards me, and manhandled me all the way back to the plane boarding line.

As to # 9 this statement is totally **false**. As previously mentioned I was handcuffed to bellychains, and the (I assume) nurse gave me two (2) small hexigon shaped bottles that I could hold in my left hand, that were joined together with what appeared to be plastic ribs, which could be seperated if need be. These two (2) bottles could not have held 8oz of water individually, nor as a unit. It is physically impossible for me to hold two (2) 8oz bottles of anything in one hand.

As to # 10 I received verbal abuse when requesting my supplies, and to have at least one hand free for self-care. He did not know what supplies I was referring to and stated that I should "deal with it" and to "shut the fuck up and hurry up." I was never assisted nor was the flight nurse called. If she was to be called in times such as what I've described, I would not have known of this procedure, and thus it would have been up to the marshal to call her, especially given my requests for colostomy supplies which is medical in nature.

4

As to # 11 Mr. Lyden's statement that neither the marshals nor the flight nurse could confirm that the plane had water in the restrooms, which is an understandable stance considering what occurred. However I can affirm that there was **no water in the restroom** used by inmates, and I believe that the marshals as well as the flight nurse knew of this. I support this with the fact that upon my first (of only two (2) trips to the restroom) I did not need to flush the toilet the first time since the pouch was full of gas only, but when I went to wash my hands there was no water. The marshal then told me to "hold out your hands" squirted what he called "hand-sanitizer" and then stated "that's all you'll need." This lack of water effected the entire passenger class, and not just myself, whom would reiterate that I gave Alaska DOC sufficient "notice" that water for me was a **requirement** in the course of my self-care, and if they in fact disscussed "all prisoner medical issues with the flight nurse," then they knew or should have known that water was **REQUIRED.**

As to # 12 it appears to merely another reiteration of a procedure **not utilized** on the flight (see # 10 above) because at no time was the "flight nurse" called in my presence when I expressed my rights under the ADA, and my needs for my colostomy supplies, and when I relayed that DOC told me that my needs would be met during the flight. This statement is not supported and in conflict with actual event that anyone could have seen that I was having difficulty with self-care during the flight, and sure could have used assistance from the flight nurse. I believe however that the mere mention of colostomy pouch was repulsive to the crew members and they would have rather not assisted.

As to # 13 this statement is irrelevant, and again it shows that the Alaska DOC believes that all colostomies are the same, act the same, and can be managed the same.

As to # 14 I cannot affirm nor deny whether or not the flight nurse had been involved in transporting 300 to 400 colostomy prisoners, whom she alleges traveled without any problems, and I would require the names of these individuals to confirm this statement, but this comparative example is irrelevant, and devoid of personal matter jurisdiction. Another unsupportable attempt to persuade using credibility.

Under the subheading: **Verbal Interaction and Abuse:** as to # 1 I can affirm that I was indeed looking forward to the changes transfer would bring and that my attitude was positive, open and optimistic (even after the airfield incident in Anchorage), that is until I was given reason to believe that all the DOC promises would not be met, and of course when marshals met my requests with verbal battery.

As to # 2 the lead marshal [ITKOWITZ] was verbally abusive, and in all of my writings I never once mentioned Seattle, so there seems to be a presumption on Mr. Lyden's part, or perhaps the persons giving him informations needed a starting point in which to begin their collective recollections.
Pure prevarications.

As to # 3 if you call expressing my needs for my supplies so I could take care of myself, and **without profanity,** and attempts to educate the marshals due to apparent lack of knowledges of ADA, Congressional Mandates and the accommodations promised me by [STOLWORTHY], then