If I had failed to do something mandated by law, and was a "law enforcement officer", and a prisoner was telling me what I was suppose to already know, and I did not like it, I guess I too would claim the prisoner verbally abused me. I can affirm that during this time, having figured out who the flight nurse actually was, stated to her "you're letting this happen, and you call yourself a nurse?"

As to # 4 This topic is irrelevant to whether or not I received proper ADA accommodations or if the marshals modified their procedures and practices during the flight to aid me in my self-care, or whether or not the flight had water, or whether or not I got my supplies. I will affirm that I did not start any negative verbal interactions with Officers Wiles, Vasey, or Ryker, and will if need be relay these at a later date for considerations.

As to # 5 (see # 4 above) but again it has no relevance to the issues, but I would like to express that it is another attempt to use credibility and that if the Alaska DOC is caught they use the term "Individual Determination" to gain control over those issues, and do so on ocassions that really don't apply, thus they successfully shift the burden and the blame to the prisoner, and they do it frequently in a myraid of different senerios, to suit their needs.

As to # 6 if asking to have restraints lossened because they were "cutting of my damned circulation", then perhaps, that is of course if the officer doing the cuffing is extremely religious or again attempting to persuade (wrongfully) using credibility. I will affirm however that numerous CIPT and AJ officers who know me well and will testfy as to my demeanor, but again this is irrelevant to the issues in question.

As to # 7 when I needed to use the restroom I whispered into the Japanese marshal's ear that I had a colostomy, so no one would hear. that I had a pouch and needed to use the restroom. It wasn't until after [ITKOWITZ] yelled to anyone listening, that "you have a colostomy, and thats what you deserve" did I make the comment suggested in rebuttal.

As to # 8 this statement made by Itkowitz is untruthful and his innapropriate assaults on me, using his hips, arms are supported by declarations of other inmates on the flight who personally witnessed this, and his culpability and cognitive awareness that he was doing what he was doing is also supported, by his witnessed actions after he bumped into me, over and over again. I will affirm that this "bumping" started after my restroom accident.

Under the subheading: **Enhanced Access:** as to # 1 what the DOC assurred me would happen and what actually happened was completely opposites, and this statement is irrelevant and self-serving of Alaska DOC, it's agents and the Marshals and it's agents.

As to # 2 I cannot affirm nor deny that I made this claim, but did in fact request one hand free, due to the extremely difficult manner I was restrained. This included, leg-shackles, handcuffed to bellychains that rode directly over the pouch which was tucked inside my pants. This made getting the pouch free very difficult, made reaching the enclosure clip at the bottom almost impossible, and getting the pouch

6

out from under the pants waist band burdensome, to say the least. The request to the marshal standing in the open doorway to the restroom, to have one hand free was a reasonable request, and modification to their transport policies and procedures, and practices (since we were 30,00,00 feet in the air) would have been prudent. According to their own statements at 3-4 it was a possibility that one of my hands could have been loosed momentarily, while I did self-care, however without the required supplies and water it was just one facet of necessary accommodations that should have been recognized and granted.

Under 28 CFR § 35.130 in pertinent part[s] states that " a public entity shall make reasonable modifications to policies, practices or procedures when modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. By the U.S. Marshal's own admission the practice I requested modified does "sometimes" take place, and thus this public entity cannot demonstrate that making the requested modification allowing me one hand free, for self-care purposes would fundamentally alter the nature of their services, programs, nor activities.

Under the subheading: **Privacy and Dignity**: as to # 1 I can affirm that by the very nature of the way I was handled and mistreated I was humiliated and dehumanized, causing trauma, when I was forced to do self-care in subzero weather behind a snowpile, without supplies, required amount of water and privacy. These acts of law enforcement does shock the conscience of decent persons, and is unexcusable.

As to # 2 this statement is self-serving of the Alaska DOC, it's agents and the Marshals and it's agents, and furthermore untruthful. Even if this statement were true there were no other inmates aboard that flight that were "similarly situated" (e.g. no other ostomates), but again the Alaska DOC generalizes and minimizes the totality of the circumstances.

As to # 3 this statement is irrelevant as to whether or not I was discriminated against as a result of my disability, nor is it relevant as it pertains to the denied, necessary colostomy supplies and accommodations I never received.

As to # 4 this statement is self-serving and utterly ludicrous, it's akin to "oh look at us , look how Well we've treated this prisoner, and he can't even be seen by the other prisoners."
But again irrelevant.

Under the subheading: **Colostomy Friendly Restroom** as to # 1 I affirm that I did, as part of my requested relief, state that all aircraft used to transport prisoners should be retro-fitted with a least one (1) ostomy friendly toileting facility. Access is not the only consideration, not the only provision that is recognized under the ADA.

In addition, under the Assistive Related Assistance for Individuals with Disabilities Act of 1988, it recognized the significant impact assistive technologies has on the lives of persons with disabilities.

7

Assistive technologies makes it possible for people with disabilities to function more independantly on a daily basis, thereby becoming more fully integrated members.

These same considerations are to be given to disabled people whom are incarcerated as well; SEE Sanders v Horn, E.D. Pa. 1997, 960 F.Supp. 893.

Assistive technology is the term used to describe a wide array of services and equipments used to assist people with disabilities, at home, work, play, and yes even in a prison transport setting. The law defines Assistive technologies as "....any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of people with disabilities."

Since Assistive technologies includes all types of equipment that is and/or may be used, adaptively, to assist a person where they need asistance, an "Ostomy Friendly Toileting Facility" on all prisoner transport aircraft, falls squarely in the purview of this "ACT" and thus is a reasonable request. Even if the statement made that 300-400 colostomy prisoners had been transported without any problems was true, just one (1) circumstance of discrimination is sufficient to warrant change, and future avoidances.

As to # 2 I cannot affirm nor deny the validity of this statement, but it would seem, as a practical matter, that at least "one accessible lavatory" be made available in not only "newer aircraft" but in any aircraft that has direct interactions and possible interactions with persons with disabilities. In the broader sense, accessibility is not the only provision that must be adressed, since some disabled persons (like myself) do not need the use of a wheelchair, but require other acommodations in the lavatories.

As to # 3 Mr. Tim Lyden actually "exempts" charter operators from their ADA legal obligations (at least for accessible lavatories) and this would imply that a charter operator could purposely discriminate depending on that aircraft's travel purposes.

Although the cited Title 14 CFR part 382.12 may be accurate as it applies to commerical aircraft, it is irrelevant in the instant case.

In the instant case Title 28 CFR § 35.102(a) definitions and 28 CFR § 35.130 tells a different rendition, which would apply to a "charter operator." When the charter operator is contracted to do the business of a public entity he/she is obligated (SEE 28 CFR § 35.130(3)(i)(ii)(iii)(4)(i)(ii)(5) " A public entity, in the selection of procurement contractor, may NOT use criteria that subjects qualified individuals with disabilities to discrimination on the basis of disability."

8

Under the heading "Conclusion" Findings: as to # 1, Mr. Lyden is mistaken when he stated that my complaint addresses having to participate in activities of the agency rather than being ecluded from the benefits or participation in its service, programs, or activities, so let us examine his presumptions, which once again attempt to negate the Alaska Department of Correction, and it's agents violations and shortsightedness, and shift the blame upon me. Even this facet of my rights under the ADA were considered by the Congressional caucus when they wrote the "Act."

When we review 28 C.F.R. § 35.130(e)(1) in pertinent part, an individual with a disability is not required to accept an accommodation, aid, service, opportunity, or benefit provided under ADA. If that be the case then I had every right to complain about participating in activities that did nothing to accommodate my disability. I read this statement as one of veiled retaliation as set out in 28 C.F.R. § 35.134 which states "No private or public entity shall discriminate against any individual because that individual has OPPOSED ANY ACT OR PRACTICE made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in ANY MANNER in an investigation, proceeding, or hearing under the ACT or this part."

For Mr. Lyden to twist, or attempt to twist ADA policy, citing just participation, is a futile approach at defending what unlawful acts [h]is personnel, and the personnel of the U.S. Marshals and Contract Air Carrier perpetrated on my person, and since a public entity shall make reasonable modifications to policies, practices, or procedures, when they are necessary to avoid discrimination on the basis of disability, the reasons for those modifications is so disabled persons can particpate in an activity without feeling set apart from the rest of the participants to the greatest extent possible, but to claim that participation is the sole complaint subject matter would suggest a minimization of the violations, and the impact it had/has on me.

As to # 2 this statement although irrelevant to the issues of whether or not my gauranteed accommodations would be readily available during flight, does support that "After he (ITKOWITZ) initiated a confrontation at my seat' it wasn't until then that I lost my resolve and was more adamant about receiving my accommodations, and having been publicly dehumanized and demoralized by this person's verbal attacks, found that my comment that I had a "bigger dick than you" was appropriate, giving the loud triade of him divulging confidential medical condition/information to the crowd of non-personnel.

Moreover Mr. Lyden states that he could not find "according to ADA law" that I was "verbally discriminated against based upon [my] disability during this interaction.' If we once again review 28 C.F.R. § 35.134(b) it states "no private or public entity shall coerce, intimidate, threaten or interfere (see also Alaska Statute 11.76.130) with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed any rights granted or protected by the ACT." I do not believe that further explanation is necessary, if you yell out that a person is disabled because that person has attempted to explain his rights, and what had occurred resulting in an accident then not only have you discriminated against that person under he ADA law, but under Civil law as well.

9

*INTERVIEW other inmates ReVol - volunteers - get list of prisoners togas w/o saw what*

As far as there being conflicting evidence is understandable, however I will supply declarations of other inmate passengers whom have voluntarily come forward, which supports my assertions and not those of the violators.

*See by case bases*

As to # 3 this statement is irrelevant and without personal matter jurisdiction, as it is another attempt to say "all colostomies/ostomates are the same, act the same, and can be managed the same. Even if this statement were true, which I'd have to have actual independant written findings, I do NOT "speak for any class" except for myself, how I was mistreated 12/14/03 on the Prisoner Transport from Alaska to Arizona, and to state that in a statement would suggest that Mr. Lyden is attempting to muddy the real issue of whether or not the Alaska Department of Corrections, it's agents, and the U.S. Marshals and it's agents and the Charter operator knew or should have known: (a) that I was comming aboard and would REQUIRE colostomy supplies specifically boxed for ready access during the flight; (b) that I'd need access to a restroom with adequate toileting facilities; (c) that I would REQUIRE water for self-care; (d) that it would be more likely than not, that modifications to U.S. Marshals policies and practices as to restraints that an ostomate would REQUIRE said modifications for self-care, due to the nature of the disability.

As to # 4 Once again Mr. Lyden attempts to minimize the trauma I faced at the hands of correctional and marshal personnel. I realize that certain aspects of incarceration relieve law enforcement from strict adherances, however what occurred 12/14/03 cannot be described as anything but indecent, shocking and cruel, and no manner of "exigent circumstances" will convince me that some other tact in handling my special needs couldn't have been devised.

*ostomy = no control — medivac — single transfer protocol*

Mr. Lyden obviously shows some regard to my allegations since he stated that he could "certainly understand the humiliating loss of privacy and **DIGNITY** which I faced."

As to # 5 Just because water aboard the aircraft "isn't normally an issue"does not absolve the department, US Marshals or the "contract" Air Carrier, to come up with a plan, especially if they knew or should have known that a person with special needs would be comming aboard, and would REQUIRE them, thus a modification to a "normal" protocol.

*\* Professionalism of DOC 1) Trash Dump 2) in Snow 3) Demeaning*

As to # 6 Apparently Mr. Lyden has missed the point here. The colostomy supplies were specially boxed at AJ by correctional staff, so that they would be readily available **DURING THE FLIGHT**", and since it has been professed by Mr. Lyden that "all prisoners medical issues were discussed on the tarmac" it seems another futile attempt to place the blame and burden on me whom has/had no control over my environment and the communication problems were, not with me who attempted over and over again, to get my supplies, only to be retaliated, yelled at, called names, intimidated, and subsequentally falsely accused of an animal act, but with those alleged to be "in control!"

*DA Program access(s) re Griffin ACCESS Act a) Fundamental alterate b) Pose a Direct Threat/Security*

As to # 7 Even if I had "false expectations" from an alleged "misinterpretation" of the phrase "Enhance access to restroom facility"which I did not I was not given the "priority" status alleged by Mr.Lyden, so the only thing "false" here is the statements given to him by correctional and U.S. Marshal personnel.

10